IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELECTRONIC ARTS, INC.,<br><br>    Plaintiff,<br><br>  v.<br><br>TEXTRON INC., BELL HELICOPTER TEXTRON INC., and TEXTRON INNOVATIONS INC.,<br><br>    Defendants.<br>                                                          /<br>AND RELATED COUNTERCLAIMS.<br>                                                           / | No. C 12-00118 WHA<br><br>**ORDER DENYING PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIMS, GRANTING IN PART AND DENYING IN PART PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE, AND VACATING HEARING** |

**INTRODUCTION**

In this declaratory relief action for non-infringement of trademarks and trade dress, plaintiff moves to dismiss defendants' Lanham Act and California state-law counterclaims pursuant to FRCP 12(b)(6) and the First Amendment. For the following reasons, plaintiff's motion is **DENIED**. The hearing scheduled for September 6 is **VACATED**.

**STATEMENT**

Counterclaim-defendant Electronic Arts Inc. is a developer and publisher of computer and video games. Counterclaim-plaintiffs are Textron Innovations Inc. and Bell Helicopter Textron Inc. Textron Innovations is the intellectual property holding company of Bell Helicopter, which is the designer and manufacturer of the helicopters to which counterclaim-plaintiffs claim intellectual property rights (Compl. ¶ 11; Dkt. No. 53 ¶¶ 9–10).

1  The instant action arises out of EA's depiction of these helicopters in its *Battlefield 3*
2  video game. *Battlefield 3* "is a realistic first-person military combat simulation that depicts
3  weapons and vehicles used by the United States military, including the Bell-manufactured AH-
4  1Z, UH-1Y, and V-22 helicopters." Players can control weapons and vehicles, and can play in
5  single-player and online multiplayer modes (Ans. ¶¶ 2, 16–17).

   The parties were involved in a prior dispute over use of Bell-manufactured vehicles in the
"Battlefield Vietnam, Battlefield Vietnam: Redux, and Battlefield 2" video games, which
resulted in a confidential settlement agreement in February 2008 (Dkt. No. 53 ¶¶ 38–40; Civil
Action No. 4-06-CV-841-A (N.D. Tex.)). In October 2010, EA paid Textron Innovations a lump
sum for a license to use certain vehicles in a "booster pack for the 'Battlefield: Bad Company 2'
game, called 'Vietnam.'" (Dkt. No. 53 ¶ 41). Textron alleges that EA has entered into licensing
arrangements with third parties in relation to other games, showing that EA's infringement of
Textron's intellectual property in the instant dispute was willful (*see id.* ¶¶ 44–47).

   In Fall 2011, the parties communicated regarding EA's planned use of the helicopters in
*Battlefield 3*, but were unable to reach agreement. EA contended that the use was expressive and
entitled to First Amendment protection, thus no license would be necessary. Textron believed
the use — in the game, packaging, and marketing materials — infringed intellectual property
rights and demanded EA cease and desist (Compl. ¶¶ 21–22; Runstadler Decl. Exhs. 6–9).

   EA filed a complaint for declaratory relief for non-infringement in January 2012. In May
2012, Textron filed its answer and the counter-complaint, which alleges six counterclaims: (1)
trademark infringement under 15 U.S.C. 1114, (2) trademark and trade dress infringement under
15 U.S.C. 1125(a), (3) false designation of origin under 15 U.S.C. 1125(a), (4) violation of
California Business and Professions Code Section 17200, (5) California common law trademark
infringement, and (6) California common law misappropriation.

   Textron alleges infringement in the *Battlefield 3* game, *Back to Karkand* expansion pack,
advertising and marketing materials, and other *Battlefield 3*-related products (Dkt. No. 53 ¶ 1).
The alleged trademarks include federally-registered trademarks: "AH-1Z" (U.S. Reg. No.
2928806), "UH-1Y" (U.S. Reg. No. 2908650), and "V-22" (U.S. Reg. No. 3063307), and

2

1  common-law trademarked product names: "VIPER," "VENOM," and "OSPREY" (*id.* ¶ 18;
2  Exh. A). The alleged trade dress includes:

> (a) the design and shape of the fuselage and chin bubble on the UH-1Y; (b) the design and shape of the tandem-seat cockpit, fuselage, and wing pylons on the AH-1Z; (c) the design and shape of the fuselage, chin bubble, wings, rotatable engines, and empennage on the V-22

(*id.* ¶ 17). EA now moves to dismiss the counterclaims as barred by the First Amendment and doctrine of nominative fair use.

**ANALYSIS**

**1. REQUEST FOR JUDICIAL NOTICE.**

EA requests this Court take judicial notice of: (1) the content and packaging of the PC edition of *Battlefield 3* (Compl., Exh. A), (2) the content of the "*Battlefield 3* Gulf of Oman Gameplay Trailer" and the "Wake Island" trailer (Lauridsen Decl., Exhs. A, B), and (3) paragraphs 4–9 of the declaration of Patrick Bach, summarizing the content of *Battlefield 3* (Dkt. No. 59). EA's request notes that the Bach declaration is intended as a FRE 1006 summary of voluminous evidence, and may be disregarded if the Court reviews the video game itself. Textron objects to this request on grounds that it "ask[s] this Court to decide the ultimate factual issues in this case outside the adversarial process" and because "the full scope of the content and features of Battlefield 3 cannot be 'accurately and readily determined' by a quick review of the game" (Dkt. No. 74 at 1, 3).

As an initial matter, this order does *not* take notice of the Bach declaration to the extent it asserts conclusions and disputed facts such as: "Battlefield 3 combines computer software engineering and *creative* audiovisual elements" (Textron's answer denies that EA's use is "creative"); that the game "is constructed from an array of *original* graphics, music, soundtrack, dialogue and information;" and that the maps, weapons, accessories, and vehicles "are designed and rendered by EA artists and developers" (a fact not readily determinable by playing the game) (*see* Bach Decl. 2–3) (emphasis added). EA may ultimately be able to prove these facts and conclusions, but such questions are inappropriate to decide on a motion to dismiss. *See United States v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011) ("[W]e may not, on the basis of

3

1  evidence outside of the Complaint, take judicial notice of facts favorable to Defendants that
2  could reasonably be disputed."). Moreover, this order recognizes the distinction between taking
3  judicial notice of facts, and drawing conclusions as to the significance of those facts — which
4  seems to be Textron's primary objection. As Textron points out, the trailers are but two
5  examples of alleged infringement, and the complete range of experiences within the game may
6  be impossible to determine due to its dynamic nature (*see* Dkt. No. 74 at 3–4).

7  This order does *not* take judicial notice of the entire game. As EA alleges in the
8  complaint, "[t]he outcome of a mission or action depends on the game player's choices and skill.
9  As a result, no two game experiences are alike" (Compl. ¶ 17). In particular, Textron alleges
10 that the "multiplayer mode allows consumers to participate in one-time battles *of their own*
11 *design* . . . in groups of *up to 64*" and that this mode is "the most popular aspect" of the game
12 (Dkt. No. 53 ¶¶ 3, 25–28) (emphasis added). Despite EA's argument that "[a]lthough the
13 interactive world of Battlefield 3 provides hours of unique game-play opportunities, EA's in-
14 game uses of Textron's purported trademarks and trade dress are unchanging, easily observed,
15 and straightforward," this order finds that the interactive nature of the game, especially in the
16 multiplayer mode, makes it an improper subject of a request for judicial notice (*see* Reply Br. 2).
17 Taking judicial notice of the entire game and all of its permutations would be like taking notice
18 of a dynamic Internet site such as Google. That said, judicial notice is appropriate for facts that
19 may be accurately and readily determined, such as the game packaging.

20 Accordingly, EA's request for judicial notice is **GRANTED** as to the game packaging, but
21 **DENIED** as to the Bach declaration, video trailers, and contents of the game CD.

22 **2. FIRST AMENDMENT DEFENSE.**

23 The parties disagree over the appropriate legal standard for EA's First Amendment
24 defense. EA urges application of the *Rogers* test, which weighs the "public interest in avoiding
25 consumer confusion" against the "public interest in free expression," such that trademark
26 infringement does not apply unless the use "has no artistic relevance to the underlying work
27 whatsoever, or, if it has some artistic relevance, unless [it] explicitly misleads as to the source or
28 the content of the work." *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989). Even assuming

4

1 that *Rogers* applies, a proposition in dispute, EA's arguments fail under the second prong of the
2 *Rogers* test.

3 The second prong of the *Rogers* test considers whether the use "explicitly misleads as to
4 the source or content of the work," and "points directly at the purpose of trademark law, namely
5 to 'avoid confusion in the marketplace by allowing a trademark owner to prevent others from
6 duping consumers into buying a product they mistakenly believe is sponsored by the trademark
7 owner.'" *See ibid.*; *E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1100 (9th
8 Cir. 2008) (quoting *Mattel, Inc. v. Walking Mountain Prods*, 353 F.3d 792, 806 (9th Cir. 2003)
9 (internal quotation marks and alteration omitted)). This prong is where EA fails to meet its
10 burden.

11 Because this is a motion to dismiss, the Court "must take all of the factual allegations in
12 the complaint as true," though it is "not bound to accept as true a legal conclusion couched as a
13 factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.*
14 *Twombly*, 550 U.S. 544, 555 (2007)) (internal quotation marks omitted). Textron pleads the
15 following allegations, which collectively support an inference that *Battlefield 3* and its
16 advertising are misleading as to source or content:

> The ability to interact with and fly the[] Bell-Manufactured Helicopters in EA's Battlefield 3 Products factors into consumer decisions over whether to purchase Battlefield 3 and related products.

\* \* \*

> The AH-1Z and UH-1Y helicopters bearing Textron Trade Dress and Trademarks are given particular prominence in the game. The AH-1Z is the primary attack helicopter, while the UH-1Y is the primary transport helicopter.

\* \* \*

> On a webpage telling customers to "buy now," EA entices consumers to purchase its Battlefield 3 Products specifically by advertising the AH-1Z: [image omitted].

\* \* \*

> On [its website], EA included an image of Bell's AH-1Z helicopter and promoted use of the Bell-Manufactured Helicopter to consumers: "[F]ly your squad straight to the action or engage enemy targets directly from your heli." [Image omitted].

5

>                           *          *          *
>
> EA's use of the Textron Trade Dress and Trademarks in the Battlefield 3 Products has created and is likely to continue to create consumer confusion as to the source, affiliation, or sponsorship of the trademarked products in the video games.
>
>                           *          *          *
>
> Consumers of these games expect that the intellectual property of a party is used with the permission and approval of the mark's owner, particularly when a purpose of the game is to realistically simulate the use of a product associated with the mark.
>
>                           *          *          *
>
> EA . . . deliberately and willfully used and continues to use the Textron Innovations Registered Marks so as to cause confusion or mistake or to deceive consumers.

(Dkt. No. 53 ¶¶ 4, 24, 31, 33, 48–49, 55). EA disagrees, but for purposes of the instant motion, this order does not weigh EA's evidence against Textron's. Rather, it assesses whether Textron states a plausible claim for relief.

EA contends that the "likelihood of confusion" analysis should not come into play unless the work fails the *Rogers* test (Reply Br. 10). Our court of appeals in *E.S.S.*, however, looked at "whether the Game would confuse its players into thinking that the Play Pen is somehow behind the Pig Pen or that it sponsors Rockstar's product" when it evaluated the second prong of the *Rogers* test. 547 F.3d at 1100. Our court of appeals considered that the strip club was "incidental" to the game; consumers would not "reasonably have believed that ESS produced the video game;" it was "far-fetched that someone playing [the game] would think ESS had provided whatever expertise, support, or unique strip-club knowledge it possesses to the game;" and "the chance to attend a virtual strip club is unambiguously *not* the main selling point of the Game." *Id.* at 1100–01. In contrast, here, it is plausible that consumers could think Textron provided expertise and knowledge to the game in order to create its realistic simulation of the actual workings of the Bell-manufactured helicopters. Textron alleges that its helicopters are "given particular prominence" as opposed to being merely "incidental," and the ability to control vehicles such as the helicopters in question is a major reason for the game's success (*see* Dkt. No. 53 ¶¶ 4, 24–29); therefore, consumers could plausibly think Textron sponsored the game.

6

1 Although consumers are unlikely to think Textron has entered the video-game business, Textron
2 has alleged sufficient facts to support the inference that the game explicitly leads consumers to
3 believe it is "somehow behind" or "sponsors" *Battlefield 3*.

4 EA also asserts that "'mere use' of purported trademarks or trade dress as part of an
5 expressive work is not sufficient to demonstrate explicit misrepresentation as to the source or
6 content of the game" (Br. 15). While this is true, the counter-complaint alleges more than "mere
7 use." As stated, it alleges that the helicopters were a main selling point for the game, and EA
8 intended consumer confusion. On a motion to dismiss, this is sufficient to defeat this prong of
9 *Rogers*. *See Dita, Inc. v. Mendez*, No. CV 10-6277 PSG, 2010 WL 5140855, at *3 (C.D. Cal.
10 Dec. 14, 2010) (Gutierrez, J.).

11 EA also points to the disclaimer on the packaging, "DEPICTION OF ANY WEAPON
12 OR VEHICLE IN THIS GAME DOES NOT INDICATE AFFILIATION, SPONSORSHIP OR
13 ENDORSEMENT BY ANY WEAPON OR VEHICLE MANUFACTURER," as showing that
14 the use of the helicopters cannot be explicitly misleading (Compl. Exh A.). While this fact may
15 support a finding that the packaging was not misleading, it is not conclusive. Plausibly, the
16 disclaimer might not be seen by teenage users, for example, anxious to rip open the package and
17 play in the game.

18 Textron's allegations are sufficient to establish plausible disputes as to the existence of
19 actual consumer confusion and the effectiveness of the disclaimer. Accordingly, EA's motion to
20 dismiss the counterclaims on First Amendment grounds is **DENIED**.

21     **3. NOMINATIVE FAIR USE.**

22 The "nominative fair use" defense encompasses "a class of cases where the use of the
23 trademark does not attempt to capitalize on consumer confusion or to appropriate the cachet of
24 one product for a different one." Nominative fair use occurs "where the only word reasonably
25 available to describe a particular thing is pressed into service" and therefore, "such use is fair
26 because it does not imply sponsorship or endorsement by the trademark holder." *See New Kids*
27 *on the Block v. News Am. Publ'g Inc.*, 971 F.2d 302, 308 (9th Cir. 1992). It requires proof of the
28 following three elements:

7

> First, the product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.

*Ibid.* (footnote omitted).

Nominative fair use analysis typically involves questions of law and fact, and determination on a motion to dismiss is premature. *See Autodesk, Inc. v. Dassault Systemes SolidWorks Corp.*, C08-04397 WHA, 2008 WL 6742224, at *5 (N.D. Cal. Dec. 18, 2008) (Alsup, J.). An exception exists "where simply looking at the work itself, and the context in which it appears, demonstrates how implausible it is that a viewer will be confused into believing that the plaintiff endorsed the defendant's work." *Louis Vuitton Mallatier S.A. v. Warner Bros. Entm't Inc.*, 11 CIV. 9436 ALC HBP, 2012 WL 2248593, at *8 (S.D.N.Y. Jun. 15, 2012) (citing cases). EA argues that nominative fair use is evident from "allegations made by Textron, or subject to judicial notice" (*see* Reply Br. 3–4). To the contrary, this order finds the counterclaims raise factual questions that make a nominal fair use determination inappropriate at this time.

EA's motion must be denied because there are questions of disputed fact as to all three elements. *First*, the parties disagree as to whether the helicopters are readily identifiable without use of the trademark (*see* Opp. 22; Reply Br. 13). *Second*, the parties dispute whether EA used more of the marks than necessary to identify the helicopters (*see* Opp. 22–23; Reply Br. 13). *Third*, whether EA suggested Textron's sponsorship or endorsement of the game was discussed under the second prong of the *Rogers* test above, and as stated, this order finds that the pleadings raise sufficient questions as to consumer confusion. Notably, our court of appeals has held that customary practice in certain contexts, such as television commercials, may give rise to an implied endorsement, and "[l]ikelihood of confusion as to endorsement is therefore a question for the jury." *Abdul-Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 413 (9th Cir. 1996). Textron alleges that "[c]onsumers of these games expect that the intellectual property of a party is used with the permission and approval of the mark's owner" (Dkt. No. 53 ¶ 49) (citing examples).

8

Textron's allegations are sufficient to defeat a nominative fair use defense at this stage; accordingly, EA's motion to dismiss is **DENIED**.

## CONCLUSION

For the foregoing reasons, plaintiff's motion to dismiss the counterclaims is **DENIED**. The hearing scheduled for September 6 is **VACATED**. This is a Rule 12 motion that really amounts to a summary judgment motion and was very premature. No more summary judgment motions shall be brought herein until the end of the discovery period without prior permission, such permission to be sought in advance via a five-page precis explaining the proposed motion.

**IT IS SO ORDERED.**

Dated: July 25, 2012

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE